UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17CR145 HEA/NCC |
| | ) | |
| JERALD W. JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM, AND REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Defendant filed a Motion to Suppress Evidence (Doc. #24) and the government filed a Response (Doc. #25).  Based on the evidence and testimony adduced, as well as a review of the transcript of the hearing held in this matter; and having had an opportunity to evaluate the credibility of the witnesses and to observe their behavior, the undersigned makes the following finds of fact and conclusions of law.

### FINDINGS OF FACT

On August 27, 2015, Officer Casey Hill with the Washington, Missouri Police department in Franklin County was working as the school resource officer at Washington Middle School.  A school counselor contacted Officer Hill with information about two female students and their recent encounter with defendant Jerald Johnson.  One of the girls, who was identified

by Officer Hill as "M.C.,"[1] had told a classmate that she participated in a recent photo shoot. This information was reported to adults at the school.  When questioned about the circumstances, M.C. explained that the photo shoot was not sexual and did not include nudity, but she admitted to wearing lingerie-type outfits provided to her.  She also reported to the school counselor that she was with her ten-year-old friend, "A.S.," during the night of August 26th when all of this occurred.  The girls were together apparently for a sleepover, and they were out walking to a local Sonic restaurant around dinnertime when they met a woman who purportedly took them to a location for a photo shoot.

Officer Hill interviewed M.C., who initially told him that a woman named "Jenny" took her and her ten-year-old friend to a house.  M.C. was 13 years old at the time, and Officer Hill thought M.C. looked her age and acted with the relative maturity of a girl of her age.  He thought her voice and demeanor would have been very immature if she was thought to be 18 years old. Officer Hill acknowledged on cross examination that sometimes individuals can be wrong in estimating the age of another person, but with respect to M.C., her facial features and body composition were consistent with her age.  Officer Hill had four years of experience with the police department at the time of these events.

Officer Hill testified that M.C.'s account was confusing to follow about whether a man was present at the house where the photographs were taken.  M.C. said that she was dressed in lingerie that was provided to her so that she could pose for the photographs.  M.C.'s story began to change and "break down" and the girl eventually told Officer Hill that she and her ten-year-old friend were walking from a family friend's residence when they met a man named Jerry

---

[1] During the hearing before the undersigned, counsel for the government and the witnesses referred to this juvenile as M.J.  Officer Hill's search warrant affidavit and the government's response refer to this juvenile as M.C. The undersigned will refer to the juvenile as M.C. consistent with the August 27th search warrant affidavit.

along the way, which eventually led to a photo shoot at Jerry's residence.[2]  M.C. did not know

Jerry prior to this encounter.

M.C. reported that Jerry told the girls that he was photographer.  The girls discussed with

defendant the pictures he had hanging on his wall inside the house.  Later, M.C. took off her

clothing in Jerry's bathroom to change into the lingerie that he provided.  She posed for

photographs but she was unsure what photographs, if any, were taken of her ten-year-old friend

who also changed clothes.  Later, she said Jerry drove them near her home but he did not give

them a ride all the way home.

Officer Hill contacted M.C.'s father who came to the school.  Officer Hill also contacted

his supervisor, Det. Sgt. Steven Sitzes, who had more experience with such investigations.  Det.

Sgt. Sitzes responded to the school.  They asked her about Jerry's house.  M.C. said that she

could identify the house, but she could not describe it.  Thereafter, M.C. rode with her dad and

they were followed by the police to identify the house.  M.C. identified the house and she saw

Jerry sitting on the front porch when they passed by.  After obtaining this information from

M.C., Det. Sitzes and Officer Hill approached defendant on his porch.

Upon seeing officers approach, defendant made the spontaneous statement, "I guess you

guys are here about those two girls from the other night."  Officer Hill confirmed that they were

investigating the matter.  Defendant said that he took photographs and he voluntarily showed

officers two photographs of the girls that were on his cellular telephone.  The photographs on

defendant's cellular telephone were images of the girls fully clothed, appearing to be outside

defendant's house.

---

[2] "Jenny" is a fictitious person.

Defendant also told officers that he met the girls when they were walking by his house. He was working in his yard and they asked him for cigarettes. He said, "no" but he eventually offered them sodas to drink because it was hot outside. Officer Hill assumed that defendant did not offer cigarettes to the girls because he knew they were too young to smoke. Officer Hill asked whether defendant had other photographs of the girls. He said that he had recently developed some film that was inside his house.

Defendant invited the two officers inside his residence, where he lived alone, to see his photographs. Officer Hill observed pictures hanging on a wall of young women in various stages of dress, including lingerie, bathing suits and some posed in the nude in defendant's living room. They entered defendant's basement and saw professional lighting, cameras, reflectors, backdrops and a table that was covered in what looked like velvet fabric. They also saw lingerie. Officers walked upstairs to a small "dark room" where defendant showed Det. Sgt. Sitzes additional photographs that he said he developed recently. Officer Hill saw photographic negatives but he did not enter the space.

Defendant Johnson also showed officers digital photographs on his computer in a different room upstairs. He scrolled through images and showed officers a photograph of M.C. in which she posed on a table with one leg up, wearing red lingerie and lipstick, and blowing a kiss to the camera. Her breasts were "pushed out" and her back was arched. And Officer Hill saw a picture of ten-year-old A.S. wearing a wig and a knee-length dress. Officer Hill did not see all of the photographs on defendant's computer but he was sufficiently concerned that he asked for permission to search defendant's computer and files. The request to search occurred after the two officers walked back downstairs in defendant's dining room on the main floor. The tenor of the conversation was friendly.

4

Defendant would not clarify either his refusal for a search or his permission for it.  He went "back and forth" about whether he should or not.  Officers did not threaten defendant and he was not under arrest.  *Miranda* warnings were not given to defendant, nor did they attempt to interview him.

During this time, defendant made statements about his encounter with the girls, including stating that after he took photographs of the girls, he ordered a pizza for the three of them to eat for dinner, and he and the two girls watched a movie inside his house before he dropped them off at the Sonic and he returned home at around 10:45 p.m.  Defendant told officers that he knew the younger girl was "too young" and he asked M.C. for identification, which she did not produce so he did not photograph her in the nude when M.C. asked him to do so.  Officers told defendant the ages of the two girls and defendant commented that he had never seen a 13 year old with a body like that.

Officer Hill thought that the circumstances were strange, given that the girls looked underage to him and because M.C. and her friend were complete strangers to defendant prior to their walking onto his property and conversing with him.  And defendant did not know the girls' full names, even after taking their photographs and serving them dinner.  Officer Hill also wondered whether defendant had recording devices in the bathroom where the girls changed clothes, given that he had other cameras for photography in his basement.  Officer Hill also thought it was a problem that defendant offered to delete the files after they asked for consent to search his electronic devices.

Officers contacted Captain Charles Subke with the Franklin County Sheriff's Department, and they decided to seek a search warrant for defendant's residence.[3] *See* (Gov't Exs. 1-2). Capt. Subke testified at the hearing. He has 16 years of experience investigating child-related offenses such as child pornography and child enticement. He is the lead officer of the Franklin County Detective Bureau and a commander with Missouri's Internet Crimes Against Children (ICAC), which includes his oversight of several Missouri counties. The purpose of the ICAC association is for law enforcement agencies to work together in investigating sexual crimes against children so that they can draw on their collective expertise and share information.

Sgt. Sitzes forwarded copies of M.C.'s photographs to Capt. Subke, who considered the poses to be provocative based on his training and experience. He considered it an uncommon circumstance for a 13-year-old girl and her 10-year-old friend to be at a house of a stranger where such photos would be taken. He noted at the hearing that defendant's offer to delete photographic images suggested that defendant has something he wanted to hide. He also knew that adults who engage in child enticement typically engage children between the ages of 10 and 14 via social media applications and through phone conversations to disrobe and take selfies to be forwarded to the adult. Rewards of food, like pizza, and offers to show a movie[4] are methods familiar to him that adults use to gain trust and establish a sense of comfort with the children they target. The poses of M.C. indicated to him the process of "grooming" that starts when an

---

[3] Law enforcement officers in Washington, Missouri and the Franklin County Sheriff's Department obtained two state search warrants in this case. They are incorporated by reference as if fully set out here. They are the best evidence of their contents.

Officer Hill also testified, based on his training and experience, he was concerned that defendant was attempting to groom the girls for future contact and to gain their trust. There is no reference to grooming in his affidavit for the search warrant on August 27th.

[4] Capt. Subke explained that he was not aware that the juveniles watched a movie with defendant until the date of the evidentiary hearing in this case.

adult seeks to gain the trust of a child with awards in order to lure a child inside a house, and induce the child to put on certain clothes and to take photographs.  In his experience, investigations of child pornography can include finding images of a girl or boy fully clothed, leading to images of the child in underwear, then genitalia displayed, and culminating in oral sex or sexual intercourse.  Capt. Subke was also aware in his training and experience that child pornography often involves someone taking a series of pictures of the child in different settings including outdoor photographs that might otherwise be unremarkable.

Officer Hill was the affiant for the August 27th state search warrant.  Officer Hill left the residence and defendant stayed on site with Det. Sgt. Sitzes and Capt. Subke.  Other officers responded to the house and there were approximately five officers present while they waited for Officer Hill to return.  Defendant was on the front porch with Det. Sgt. Sitzes and Capt. Subke when Officer Hill returned to defendant's house with the search warrant.  The search warrant affidavit described the qualifications of Officer Hill and the location to be searched with particularity, along with a description of the items to be seized and searched.  Officers did not search the residence until Officer Hill returned with the search warrant.  They stayed with defendant and officers escorted him to get a drink after he asked.

At no time was defendant restrained.  The atmosphere at defendant's residence of August 27th was calm.  He was free to leave the property but officers told defendant that he could not be inside the residence unescorted for security reasons until the search ended.  Defendant stayed on his front porch for most of the time during the search.  Officers found a shotgun in the residence and they seized it.  Capt. Subke testified that he took this measure because he has experience with subjects of child pornography investigations displaying aggressive, assaultive behavior or

suicidal ideation.  Defendant was not agitated.  Thereafter, officers seized computer equipment, packages of small-sized lingerie and other items.

On September 3, 2015, Capt. Subke sought a second state search warrant to conduct a forensic search of the electronic equipment seized on August 27th.  Images and videos found led to the charges in this case.

Capt. Subke noted, unlike traditional glamour shots, that defendant's photographs were full body poses and showed M.C. in tight lingerie that fit close to her genitals.  He is aware that individuals who collect child pornography also often collect child erotica as companion material, based on his training and experience.

Defendant Johnson also testified at the hearing.  He described himself as a semi-professional, part-time photographer with a basement studio at his residence.  He has photographed minors previously, but mainly in a family setting.  He likes to talk to parents before taking photographs of minors and will have them to sign a release, if possible.

On August 26, 2015, he was working on equipment in his garage when he was startled by two females standing inside his garage door.  It was hot and the temperature felt to him like it was more than 100 degrees.  He said hello to them and he asked what he could do for them.  They asked him for a cigarette and a light and he noted that the older girl had cigarettes.  The younger girl was playing with her smart phone.  He said, "No" regarding the light because he did not know them.

They started chatting, and the girls explained that they came from his neighbor's residence, which led him to believe that the older girl was 18 years old.  He believed that M.C.'s height and build also made her appear to be 17 or 18 years old.

8

He observed that the girls were goofing around and taking selfies.  He told them that he had a niece "just like you" and showed M.C. and A.S. pictures of his niece on his cell phone. Defendant's niece was 15 or 16 years old.  He offered the girls sodas because of the heat.  They accepted.  He went into the house and brought the drinks out to his garage where they had their beverages.  They chatted some more and the girls were acting "silly" for a while.  They asked if defendant could take their photographs because, having seen the photographs of defendant's niece, they knew that he was a photographer.  He agreed and took the girls to his basement studio.

They asked if he had outfits that they could wear.  Defendant had a wide range of dresses, some of which were lingerie, and he insisted that they select from the opaque outfits because M.C. had no identification to prove her age.  M.C. wanted nude photographs and defendant declined.  She posed herself.  A.S. was being "goofy" and dancing around with her phone during this exchange.  A.S. asked if she could wear a wig and take pictures in a black dress.  He agreed. He did not see them undress.

Defendant determined the girls' first names over the course of the hours that they were in his presence and he heard the girls address each other.  He did not know where they lived.

As it was getting late, defendant told M.C. and A.S. that they needed to go.  He wanted to call their parents if they were going to stay at his house any longer.  The girls did not want to call their parents.  They insisted on staying.  He told them to leave several times but he did not want to be rude to them or force them out of his house.

Defendant decided to order a pizza because he was hungry and did not want to cook.  The three of them ate pizza and started to watch a movie called *The Crow*.  He told the girls after watching the movie for about 30 minutes, and realizing that his clock was broken, that they

would need to leave or call their parents.  Defendant wanted to talk to the parents of M.C. and A.S. to discuss the photographs that he took, to arrange additional photographs and discuss M.C.'s age.  The girls refused to give him A.S.'s phone or their parents' contact information.  He did not know how to react to a situation that he thought was spiraling out of control.  He told them, "We're going, or I'm calling the police."  Defendant drove the girls to the Sonic restaurant at their request because they did not want to tell him where they lived.

When the officers served the search warrant on August 27th, defendant said he was escorted to his front porch and they hovered over him.  They told him that he could leave the house "to them," which he thought was weird.  He testified that they did not let him leave.  He asked to call a lawyer and they told him, "Not now."  Defendant's neighbor stopped by the house.  Officers told the neighbor not to approach but that he could speak from the distance where he stood.

On cross examination, defendant agreed that the police should have asked him about the "awkward" situation of him having two children that he did not know come into his house and be photographed by him.  He acknowledged that he was in control of his house when the girls refused to leave.  He was not sure how old M.C. was at the time and whether she could consent to the photographs of her own accord.  He agreed that obtaining a signed release would have been a reasonable, prudent thing to secure before taking photographs.  In his opinion, M.C.'s outfit for the photo shoot was a dress, not lingerie.  M.C. wanted to be photographed in poses that defendant refused to take or that he deleted because he thought them inappropriate.  Defendant also testified that the police got "in my face about it."

## DISCUSSION

**Motion To Suppress (Doc. #24)**

A.  **The Fourth Amendment Was Not Violated When Defendant Invited Officers To See Contents Of His Personal And Real Property And He Was Not Detained On August 27, 2015**

Defendant contends that he was told he could not leave his residence on August 27th.  He argues that there was no probable cause to support a finding of criminality on his part that justified his detention.  The government counters that defendant was not detained or arrested when officers encountered him on August 27th.

The record supports the government's view that defendant was not detained and officers' actions were lawful.

In *United States v. Poitier*, 818 F.2d 679, 682 (8th Cir. 1987), the Eighth Circuit noted that,

> Supreme Court jurisprudence has placed police-citizen encounters into three tiers or categories: First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the Fourth Amendment. Second, there are the so-called *Terry*-type stops. These are brief, minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by a reasonable suspicion of criminal activity. Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

*Id.*

Here, defendant was not detained when he was first interviewed by officers.  He sat on his porch when they initially talked to him.  He invited a dialogue and testified that he knew that the police would probably have questions for him because of the unusual circumstances of his encounter with M.C. and A.S.  He showed them his cell phone pictures and invited them inside, when they asked if he had other photographs.  The Fourth Amendment is not implicated when a person voluntarily shows his cell phone images to police officers.  *See United States v. Morgan*, 842

11

F.3d 1070 (8th Cir. 2016)(denying motion to suppress evidence in a child pornography case where defendant showed his cell phone to investigators). *Kyllo v. United States*, 533 U.S. 27, 33 (2001)(noting "visual observation is no 'search' at all").

Additionally, the Supreme Court has noted that in situations where a police officer approaches a person in a public place and poses questions to that person who is willing to listen does not transform the encounter into a seizure simply because the inquiry comes from law enforcement. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). *See also Florida v. Rodriguez*, 469 U.S. 1, 5 (1984); *United States v. Drayton*, 536 U.S. 194, 200 (2002)("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable searches and seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."). "Mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Voluntary answers to these questions may be used in criminal proceedings as evidence. And the specific facts of a police-citizen encounter must be considered. *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003)(question of seizure determined on case-by-case basis, as "no litmus-paper test exists for distinguishing a consensual encounter from a seizure."), *cert. denied*, 540 U.S. 962 (2003), citing *United States v. Ninety One Thousand Nine Hundred Sixty Dollars*, 897 F.2d 1457, 1461 (8th Cir. 1990). Efforts by the police to communicate with a person on the street may become a Fourth Amendment seizure if by means of physical force or show of authority the person's freedom of movement is restrained to the extent that, considering the totality of the circumstances, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). This case is distinguishable only to the extent that the officers approached defendant on his property.

But he was free to leave, go inside or ignore their inquiries.  Instead, he willingly engaged

officers in a dialogue about M.C. and A.S.  This initial contact was a consensual encounter,

which he was free to terminate.

Further, defendant invited officers onto his property to show them his studio, dark room

and computer room.  "In order for a consensual search to be valid, consent must actually be

given (either express or implied), and the person giving consent must have (actual or apparent)

authority to do so."  *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008).  The question

is not whether a defendant subjectively consented, "but rather, whether a reasonable officer

would believe consent was given."  *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011).

Any claim that defendant was detained when he consented to a search of areas of his residence is

unavailing because there is no evidence that officers exceeded the scope of the search, or that

defendant did not feel free to leave or to ask them to leave at during the time he gave them a tour.

He was not handcuffed or arrested and he could have asked them to leave.

By opening his door, defendant invited further inquiry into his actions the day before that

also gave rise to officers' questions about his knowledge of the girls.  Once inside, officers

observed in plain view pictures hanging of women in various stages of undress.  They saw

lingerie and other outfits in the basement studio that was consistent with the statements made by

M.C.  They observed his dark room and saw his storage capacity for digital photography in his

computer.  They were aware of the unusual circumstances that led to defendant meeting the girls

and hosting them in his house at night without their parents' knowledge or permission.  Officers

were also familiar with the concept of adults who groom children for an unlawful purpose, often

leading to criminal enticement of a minor or child pornography crimes.  They consulted with

Capt. Subke who knew that the child subjects of pornography often are photographed or

13

videotaped in a series of images. These images often depict an increasing level of nudity or sexuality of the child subject.

Thus, officers had probable cause for believing that evidence of a crime might be found under the totality of the circumstances when they ask for consent to search. *See, generally, United States v. Notman*, 831 F.3d 1084 (8th Cir. 2016). The undersigned is not aware of any legal principle that suggests when police ask for consent to search a person's property such a request can be viewed as a constraint upon that person's liberty. And *Pointier*, *supra*, says otherwise. Moreover, upon asking, defendant made an offer to delete photographs which—regardless of his intentions or possible motives—created legitimate concerns that defendant would destroy potential evidence of a crime if he was left alone. All this is consistent with Officer Hill's credible testimony that they told defendant that he could leave the house while they obtained a search warrant for the property. Capt. Subke also testified that defendant could leave. And defendant testified that they told him he could leave. It is not credible that they forced him to stay or got in his face. Once that decision was made, officers could lawfully escort him for a drink was lawful in light of their security concerns and for the exigency that defendant suggested that he might destroy evidence. Exigent circumstances exist when evidence is in danger of being destroyed, *Ker v. California*, 374 U.S. 23 (1963); or when the lives of the officers or other members of the public are in jeopardy, *Warden v. Hayden*, 387 U.S. 294 (1967).

Moreover, the government points out that these events led to the seizure or detention of defendant's property as opposed to himself, while officers waited for a search warrant. The Eighth Circuit considers that the detention of property does not violate the Fourth Amendment when officers have probable cause to believe that there is evidence of a crime and "and if the exigencies of the circumstances demand it or some other recognized exception to the warrant

requirement is present." *United States v. Clutter*, 674 F.3d 980, 985 (8th Cir. 2012).  The undersigned finds that there was probable cause on these facts.  *Notman*, 831 F.3d at 1089.

Finally, even if defendant was detained by officers after they obtained and served the August 27th search warrant, such a detention was lawful.  The rule in *Michigan v. Summers*, 452 U.S. 692 (1981) applies to this case.  "The *Summers* rule permits officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted,'" *Bailey v. United States*, 133 S.Ct. 1031 (2013) (quoting *Summers*, 452 U.S., at 705, 101 S.Ct. 2587, even when there is no particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers, *Muehler v. Mena*, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299). Detention is permitted "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." *Id.*, at 98, 125 S.Ct. 1465. Defendant's presence presented an ongoing security risk and possible interference with the investigation.  Therefore, the officers' escort of defendant around the premises or their decision to limit his access to certain areas of his property was reasonable and lawful.  This point should be denied.

### B.    The State Search Warrants Were Based On Probable Cause

The Fourth Amendment requires that a search warrant be supported by probable cause. *Notman*, 831 F.3d at 1089; *United States v. Montes-Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009).  The United States Supreme Court has defined probable cause to search as "a fair probability that the contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  To be valid, search warrants must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be

searched. *Johnson v. United States*, 333 U.S. 10 (1948); *Warden v. Hayden*, 387 U.S. 294

(1967). *See also*, Fed. R. Crim. P. 41. Stated another way:

> If an affidavit in support of a Search Warrant "sets forth sufficient facts to
> lead a prudent person to believe that there is a 'fair probability that
> contraband or evidence of a crime will be found in a particular place,'
> "probable cause to issue the warrant has been established."

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *United States v. Warford*, 439

F.3d 836, 841 (8th Cir. 2006)).

The Supreme Court has determined what quantum of evidence is needed to meet this

probable cause standard:

> In dealing with probable cause, … however, as the very name implies,
> we deal with probabilities. These are not technical; they are the factual
> and practical considerations of everyday life on which reasonable
> and prudent men, not legal technicians, act.

*Brinegar v. United States*, 338 U.S. 160, 175 (1979).

Probable cause is a "fluid concept—turning on the assessment of probabilities in

particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."

*See Illinois v. Gates*, 462 U.S. at 232. Further, probable cause in an affidavit "must be seen and

weighed not in terms of library analysis by scholars, but as understood by those versed in the

field of law enforcement." *Id.* Probable cause may be based on the totality of the circumstances

present and, as a result, affidavits should not be read in a grudging, hyper-technical fashion. *See*

*United States v. Ventresca*, 380 U.S. 102, 109 (1965). Probable cause may be established in a

variety of ways, including reliance on hearsay statements from reliable persons; hearsay

statements from confidential informants corroborated by independent investigation; or on the

observations of trained law enforcement officers. *See Gates*, 462 U.S. at 245; *Draper v. United*

*States*, 358 U.S. 307, 313 (1959); and *McDonald v. United States*, 335 U.S. 451, 454 (1948).

While a variety of methods are commonly used to establish probable cause, the ones listed here are by no means all-inclusive.  Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented.  *Gates*, 462 U.S. at 233.  Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.  *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).  Not only may an issuing judge "draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, we have also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant."  *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000) (citations omitted).  *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir.), cert. denied, 137 S. Ct. 2177, 198 L. Ed. 2d 245 (2017).  Once a judicial officer has issued a warrant upon a finding of probable cause, such a finding deserves great deference and the role of the reviewing court is "simply to ensure [the issuing judge] had a substantial basis" for the finding.  *Illinois v. Gates*, 462 U.S. at 236.

As discussed above, in this case, there are various factual circumstances upon which officers could reasonably rely to make the probable cause determination that defendant's electronic equipment contained evidence of a crime.  Affiants considered the highly unusual circumstances of how defendant met the girls that led to him inviting them into his house.  M.C. and A.S. were strangers to defendant, who was a man, living alone.  He testified that the two girls entered his garage without invitation.  Rather than turn them away, he organized a photo shoot for them, allowed them to stay in his house, invited them to eat pizza with him and watch a movie.  He allowed the girls to take off their clothing in his bathroom without parental supervision and he discussed with the girls pictures on his wall of other females in various stages

17

of undress. He did not insist that they leave until well after dark, telling officers he returned home at approximately 10:45 p.m. after dropping them off at the Sonic. Thus, he made no effort to speak to the girls' parents even though he told the police he wanted to speak with them. He kept pictures of the girls on his cell phone, which in today's world often operates as a digital photo album. And he commented on M.C.'s body development to officers, and testified at the hearing before the undersigned, in a manner that suggested that he viewed her body in a way that is discordant with her age and his testimony she acted goofy and silly in his presence. Further, Officer Hill had experience working around children at the middle school and thought that M.C. acted like her age, and could not likely be mistaken for a young adult female. Capt. Subke had extensive training and experience regarding adults who groom children to entice them and as a source of child pornography.

Affiants knew that defendant offered to delete images as a way to avoid further entreaties to search his personal and real property. This reasonably suggested to the trained officers and the issuing judges that his electronic equipment could contain evidence of a crime under the totality of the circumstances. As the government notes, the August 27th state search warrant makes reference generally to the crime of child pornography. Mo. Rev. Stat. § 573.037.1 states a violation if a person "knowingly or recklessly possesses any … obscene material portraying what appears to be a minor less than eighteen years of age." *Id.* All these circumstances discussed here support the probable cause finding under the totality of the circumstances to the issuing judges that a violation of Missouri's child pornography law had occurred. But the parties agree that the photographs known to be taken of M.C. in lingerie were not child pornography. Nevertheless, this child erotica, as identified by Capt. Subke in his affidavit supported the probable cause finding for the search warrants to issue because of the tendencies of collectors of

18

child erotica to also possess child pornography when combined with other factors. Therefore, to the extent that defendant argues that his provocative pictures of M.C. do not rise to probable cause of a crime, this argument is unavailing because it fails to consider the entirety of the events known to officers. *See United States v. Hansel*, 524 F.3d 841 (8th Cir. 2008) ("Hansel rests his argument that the affidavit did not establish probable cause on the theory that the possession of child erotica, which is not illegal, cannot establish probable cause that the individual also possesses child pornography. Hansel's argument fails to take into consideration the totality of the circumstances); citing *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007).

Additionally, based on officers' training and experience, it was also reasonably probable under the totality of the circumstances that defendant's computer and other electronic equipment could contain images of M.C. or A.S. that could be defined as child pornography for the judge to issue the warrant attested to by Capt. Subke. *See, e.g., United States v. Allen*, 297 F.3d 790, 794 (8th Cir. 2002)(holding that it is proper for appeals court to consider all the facts included in a search warrant affidavit "for their cumulative meaning"). *See also United States v. Brackett*, 846 F.3d 987 (8th Cir. 2017)(denying motion to suppress search warrant for lack of probable cause in a child pornography case and citing *Brewer*, 588 F.3d at 1170-71 for the proposition that the court did review state-law definition of "child pornography" and apply federal Fourth Amendment standards to determine whether the affidavit set forth sufficient detail to support a probable cause finding). This point should be denied.

### C.    Officers Could Rely In Good Faith On The Issuance Of The Search Warrants

The government also argues that the affiants in this case had a good faith basis to rely on the search warrants. The court finds that good faith was well founded.

19

*United States v. Leon*, 468 U.S. 897 (1984) provides that it is reasonable for investigators who executed the warrant to rely upon it in good faith.  In *Leon*, the Supreme Court considered whether the exclusionary rule ought to be applied in the case where the lower courts concluded that the subject search warrant was not supported by probable cause in the attached affidavit. The Supreme Court weighed the question of whether the issuing judge acted with detached and neutral scrutiny and decided if so, then the judge's probable cause ruling should be given deference.  468 U.S. at 913-14.  In this case, defendant has not shown that the issuing judge acted other than in a detached and neutral manner.  It follows from the totality of the circumstances of this case that the issuing judges acted in a way that was consistent with "the detached scrutiny of a neutral magistrate."  *Id.* at 913.  There is no evidence before this court that indicates that the issuing judges acted as a "rubber stamp for the police."  *Id.* at 914.

Next, the Supreme Court considered that deference to the issuing judges may diminish in light of the type of knowing or reckless falsity in the affidavit that was the subject of *Franks v. Delaware*, 438 U.S. 154 (1978).  Defendant makes no such claim in this case.  *United States v. Finley*, 612 F.3d 998, 1002-03 (8th Cir. 2010).

Further, the Supreme Court considered that applying the exclusionary rule,

> is not necessary meaningfully to inform judicial officers of their
> errors, and we cannot conclude that admitting evidence obtained
> pursuant to a warrant while at the same time declaring that the
> warrant was somehow defective will in any way reduce judicial
> officers' professional incentives to comply with the Fourth
> Amendment, encourage them to repeat their mistakes, or lead to
> the granting of all colorable warrant requests.

*Leon*, 468 U.S. at 917.

Finally, the Supreme Court considered whether the form of the issued warrant was technically sufficient. *Id.* at 921. There is no evidence to the contrary. Further, the Eighth Circuit has stated

> We have recognized four circumstances that preclude a finding of good faith: "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid."

*Id.* (quoting *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011)). In evaluating a search under *Leon*, we "must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). *See also, United States v. Horton*, 863 F.3d 1041 (8th Cir. 2017). The warrant issued here met the requisite criteria. Because officers had probable cause for the search warrants and they relied in good faith on their issuance, the evidence was seized lawfully.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Jerald W. Johnson's Motion to Suppress (Doc. No. 24) be **DENIED**.

**IT IS HEREBY ORDERED** that this cause is set for trial before United States District Judge Henry E. Autrey on **Monday, November 27, 2017, at 9:30 a.m.**

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for

21

good cause is obtained.  Failure to timely file objections may result in the waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).


/s/Noelle C. Collins
United States Magistrate Judge


Dated this 12th day of October, 2017.